STATE OF MARYLAND *v.* MARGARET MELTON
PRATT

[No. 43, September Term, 1978.]

*Decided February 26, 1979.*

*Stephen Rosenbaum, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellant.

*Robert C. Heeney,* with whom was *John M. Quinn* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court.

The question presented by this criminal cause is one of first impression in this State, and yet, it involves "the oldest of the privileges for confidential communications" — that which exists between an attorney and his client. 8 J. Wigmore, *Evidence in Trials at Common Law* § 2290, at 542 (McNaughton rev. 1961). Stated succinctly, we are asked to decide whether this privilege was violated when, over objection, a psychiatrist, who was retained by defense counsel to examine his client in preparing an insanity defense, was permitted to testify at the instance of the prosecution. Because we conclude that this fundamental privilege was invaded, we will direct a new trial.[1]

The factual background here is uncomplicated and may be briefly related. On the morning of October 23, 1976, respondent Margaret Melton Pratt, after a sleepless night during which she contemplated the taking of her own life,

---

1. With this ruling it becomes unnecessary that we decide the two other issues raised by the State.

shot and killed her still-slumbering husband, William S. Pratt, in their Montgomery County apartment. After the shooting, the wife packed an overnight bag and drove to a friend's farm near Front Royal, Virginia, to visit the gravesite of her dog; she stayed several hours and then proceeded to a nearby motel to spend the night. The next morning Mrs. Pratt returned to her home and, after a short stay there, began driving aimlessly around the Bethesda-Rockville area. Realizing she would eventually be apprehended, the respondent went to the Montgomery County police and informed them of her husband's death. The officers, after verifying Mrs. Pratt's story concerning what had taken place, arrested her for murder.

Upon being indicted by the grand jury for murder and related offenses, the respondent entered pleas of not guilty and interposed a defense of insanity at the time of the commission of the alleged crimes, as is permitted by Maryland Rule 731 and section 25 of Article 59 of the Maryland Code (1957, 1972 Repl. Vol.). Thereafter, the Circuit Court for Montgomery County, as authorized by sections 23 and 25 (b) of Article 59 of the Code (1957, 1972 Repl. Vol.), ordered that the Department of Health and Mental Hygiene conduct a mental examination of Mrs. Pratt to determine her "sanity or insanity at the present time and at the time of the commission of the crime, and . . . her competenc[y] to stand trial at the present time . . . ." After an examination, the department, by its report dated December 30, 1976, informed the court that Mrs. Pratt was presently competent to stand trial and was sane at the time of the commission of the alleged offenses. Trial on the indictment began on April 18, 1977, and three days later the jury found Mrs. Pratt was sane at the time of the commission of the alleged crimes and guilty of both murder in the second degree and the use of a handgun in the commission of a felony.

Throughout the trial, Mrs. Pratt did not dispute that she had killed her husband but, instead, strenuously urged that she was insane at the time she fired the fatal shots. In support of her insanity plea, respondent presented two psychiatrists, Dr. Gerald Polin and Dr. Leon Yochelson, who testified that

at the time of the act Mrs. Pratt was, in their opinion, suffering from a mental illness of such severity that she lacked substantial capacity to conform her conduct to the requirements of the law. *See* Md. Code (1957, 1972 Repl. Vol.), Art. 59, § 25 (a). In rebuttal, the State produced three psychiatrists, all of whom agreed that the respondent was suffering from some degree of mental disorder when the shooting took place. Nonetheless, two of these medical experts testified that, under Maryland law, Mrs. Pratt was legally responsible for her act. Of these two, one, Dr. Brian Crowley, had examined the accused at the request of her attorney after being retained by him to aid in preparing support for Mrs. Pratt's insanity plea. It is the evidence given by Dr. Crowley, who testified during the trial at the request of the State and over the objection of the defense, that precipitated the controversy now before us. On appeal to the Court of Special Appeals, that court concluded that the permitting of Dr. Crowley's testimony violated the attorney-client privilege and ordered a new trial. *Pratt v. State,* 39 Md. App. 442, 387 A. 2d 779 (1978). We agree.

In this State the attorney-client privilege, deeply rooted in commow law and now memorialized in section 9-108 of the Maryland Code's (1974) Courts Article,[2] is a rule of evidence that forever bars disclosure, without the consent of the client, of all communications that pass in confidence between the client and his attorney during the course of professional employment or as an incident of professional intercourse between them. *See Harrison v. State,* 276 Md. 122, 135, 345 A. 2d 830, 838 (1975); 3 B. Jones, *The Law of Evidence*

---

2. Section 9-108 of the Courts Article provides:

A person may not be compelled to testify in violation of the attorney-client privilege. [Md. Code (1974), § 9-108 of the Courts Article.]

See also Md. Code (1957, 1976 Repl. Vol.), Art. 27A, § 8 (persons engaged by Public Defender's Office covered by attorney-client privilege). Section 9-108 is simply the statutory codification of the common-law privilege as recognized in Maryland. *See* Harrison v. State, 276 Md. 122, 135 & n. 12, 345 A. 2d 830, 838 & n. 12 (1975). For an interesting history of the evolution of the privilege see Harrison v. State, *supra,* 276 Md. at 131-33, 345 A. 2d at 836-37.

§ 21:8-:10, at 762-71 (6th ed. S. Gard 1972); 8 J. Wigmore, *supra*, § 2292, at 554. The privilege is based upon the public policy that " 'an individual in a free society should be encouraged to consult with his attorney whose function is to counsel and advise him and he should be free from apprehension of compelled disclosures by his legal advisor.' " *Harrison v. State, supra,* 276 Md. at 135, 345 A. 2d at 838 (quoting *Morris v. State,* 4 Md. App. 252, 254, 242 A. 2d 559, 560 (1968)); *accord,* 8 J. Wigmore, *supra,* § 2291, at 545. While never given an explicit constitutional underpinning, the privilege is, nevertheless, closely tied to the federal, as well as this State's, constitutional guarantees of effective assistance of counsel and could, if limited too severely, make these basic guarantees virtually meaningless. *Harrison v. State, supra,* 276 Md. at 133-34, 345 A. 2d at 837; *United States v. Alvarez,* 519 F. 2d 1036, 1045-47 (3d Cir. 1975); *see* U.S. Const. amend. VI; Md. Decl. of Rts., Art. 21.

Initially we observe that, given the complexities of modern existence, few if any lawyers could, as a practical matter, represent the interest of their clients without a variety of nonlegal assistance. Recognizing this limitation, it is now almost universally accepted in this country that the scope of the attorney-client privilege, at least in criminal causes, embraces those agents whose services are required by the attorney in order that he may properly prepare his client's case. Consequently, in line with the views of the vast majority of the courts in our sister jurisdictions, we have no hesitancy in concluding that in criminal causes communications made by a defendant to an expert in order to equip that expert with the necessary information to provide the defendant's attorney with the tools to aid him in giving his client proper legal advice are within the scope of the attorney-client privilege. *E.g., United States v. Alvarez, supra,* 519 F. 2d at 1046 (psychiatrist); *United States v. Kovel,* 296 F. 2d 918, 922 (2d Cir. 1961) (accountant); *People v. Lines,* 13 Cal. 3d 500, 531 P. 2d 793, 800-03, 119 Cal. Rptr. 225, 232-35 (1975) (psychiatrist); *accord,* 3 B. Jones, *supra,* § 21:15, at 786-87. *But cf. State v. Mingo,* 143 N.J. Super. 411, 363 A. 2d 369, 370-71 (1976) (per curiam) (because defendant's handwriting exemplars not privileged communications,

State's solicitation at trial of opinion of defense-hired graphologist as to identity of handwriting on note sent to assault victim not barred by attorney-client privilege). This is uniquely so in cases concerning the question of a criminal defendant's sanity, because the need of an attorney to consult with a qualified medical expert is paramount. Such a medical expert not only provides testimony that usually is necessary at trial to support an insanity defense, but also "attunes the lay attorney to unfamiliar but central medical concepts and enables him, as an initial matter, to assess the soundness and advisability of offering the defense ... and perhaps most importantly, ... permits a lawyer inexpert in the science of psychiatry to probe intelligently the foundations of adverse testimony." United States v. Taylor, 437 F. 2d 371, 377 n. 9 (4th Cir. 1971).

The State here does not dispute the inclusion of psychiatric communications within the scope of the attorney-client privilege; instead, it contends that when Mrs. Pratt interposed a defense of insanity, she waived the privilege with respect to all statements she may have made to any medical expert, whether in her employ or in that of the State.[3] While there is little doubt that a client may waive this right to confidentiality, which may be done either expressly or impliedly, see, e.g., Harrison v. State, supra, 276 Md. at 136-38, 345 A. 2d at 839; 8 J. Wigmore, supra, § 2327, at 634-39; but see 2 H. Underhill, Criminal Evidence § 333, at 841 (5th ed. P. Herrick 1956) (doubtful if any waiver of the privilege should be implied in criminal cause), we have been made aware of only one decision in which a court, the New York Court of Appeals, has held that raising the defense of insanity, without more, is a relinquishment of the attorney-client privilege as to communications between the client and his alienist. In its opinion the court justified its

---

3. In effect, the State asks us, by judicial decision, to create a waiver of the attorney-client privilege as the General Assembly has done by providing that, in the case of the psychiatrist/psychologist-patient privilege, if the patient "introduces his mental condition as an element of his claim or defense ...," the privilege is waived. See Md. Code (1974, 1978 Cum. Supp.), § 9-109 (d) (3) (i) of the Courts Article.

conclusion that a defendant's insanity plea waived the attorney-client privilege on the following basis:

> A defendant who seeks to introduce psychiatric testimony in support of his insanity plea may be required to disclose prior to trial the underlying basis of his alleged affliction to a prosecution psychiatrist. Hence, where, as here, a defendant reveals to the prosecution the very facts which would be secreted by the exercise of the privilege, reason does not compel the exclusion of expert testimony based on such facts, or cross-examination concerning the grounds for opinions based thereon. It follows that no harm accrues to the defense from seeking pretrial psychiatric advice where an insanity plea is actually entered, for in such circumstances, the underlying factual basis will be revealed to the prosecution psychiatrist. [*People v. Edney,* 39 N.Y.2d 620, 350 N.E.2d 400, 403, 385 N.Y.S.2d 23, 26 (1976) (citations omitted).]

While there appears to be some logic, at least in a technical sense, to New York's highest court's reasoning, nonetheless we find that the chilling effect such a result would have upon a client's willingness to confide in his attorney or any defense-employed consultants requires that we align ourselves with the overwhelming body of authority and reject that court's conclusion. *See United States v. Alvarez, supra,* 519 F. 2d at 1046; *United States ex rel. Edney v. Smith,* 425 F. Supp. 1038, 1039, 1053 (E.D. N.Y. 1976) (dicta); *People v. Lines, supra,* 531 P. 2d at 800-03, 119 Cal. Rptr. at 232-35; *Pouncy v. State,* 353 So. 2d 640, 641-42 (Fla. Dist. Ct. App. 1977); *People v. Hilliker,* 29 Mich. App. 543, 185 N.W.2d 831, 833 (1971); *State v. Kociolek,* 23 N. J. 400, 129 A. 2d 417, 423-26 (1957).

Moreover, a further drawback to the New York rule is the prejudice inherent in disclosing to the trier of fact that the source of this adverse testimony is an expert originally employed by the defendant. This factor will almost certainly carry added weight with the jury, which usually is the

prosecution's principal purpose for producing the defense-employed psychiatrist as a witness. *See United States ex rel. Edney v. Smith, supra,* 425 F. Supp. at 1053; Note, *Protecting the Confidentiality of Pretrial Psychiatric Disclosures: A Survey of Standards,* 51 N.Y.U. L. Rev. 409, 411 (1976). The potential for prejudice inherent in such evidence, as demonstrated by the State's closing argument to the jury in this case,[4] graphically illustrates that the attorney-client privilege protecting such potential testimony from disclosure should remain intact. Though the State points out that this Court previously has recognized the existence of a discretion in the trial court to permit the introduction of evidence concerning the employment posture of an expert because such evidence is frequently a useful factor in evaluating the credibility of the expert witness's testimony, *City of Baltimore v. Zell,* 279 Md. 23, 28, 367 A. 2d 14, 17 (1977), that decision arose in a civil context and does not provide a persuasive basis for employing a waiver of the attorney-client privilege in criminal causes.[5]

---

4. Concerning the testimony of Dr. Crowley, the State's Attorney argued to the jury:

> Mr. Heeney [, the defendant's attorney,] said he was glad he didn't use Dr. Crowley. If Dr. Crowley had given a different opinion, Dr. Crowley would have been in here so fast it would have made your head spin and not in my case but in Mr. Heeney's case. *They hired Dr. Crowley.* Dr. Crowley was the first defense psychiatrist to see Mrs. Pratt. He said she did not lack substantial capacity . . . . *What do they do after that? They kept looking and finally they found him. How many people didn't show up here?* I don't know the answer to that. Were there any others we don't know about? I don't know. We know they found two. [(Emphasis added.)]

5. In reaching the result we do in this case, we confine our holding to criminal causes and specifically reserve for another time the question of the scope of the attorney-client privilege when an attorney hires an expert to aid in the preparation of civil matters. Though an opponent called as his witness at trial an expert appraiser hired by his adversary in City of Baltimore v. Zell, 279 Md. 23, 367 A. 2d 14 (1977), he did so without objection and thus, in *Zell,* the question of the impact upon the attorney-client privilege of allowing that testimony was not determined by this Court. For differing views among our sister states on this subject compare People v. Donovan, 57 Cal. 2d 346, 369 P. 2d 1, 5-7, 19 Cal. Rptr. 473, 477-79 (1962) (appraiser's opinion not covered by attorney-client privilege) with State v. 62.96247 Acres of Land in New Castle County, 193 A. 2d 799, 810 (Del. Super. Ct. 1963) (attorney-client privilege bars party from compelling testimony of appraiser hired by opponent) and Lindsay v. Lipson, 367 Mich. 1, 116 N.W.2d 60, 62-63 (1962) (to allow physician hired by plaintiff in tort action to testify for defendant, over opponent's objection, violates attorney-client privilege).

An additional consequence of the State's suggested waiver rule, if adopted by us, is that the defense, in essence, would be required to assist the prosecution in discharging its burden of proof. In Maryland, as in most other jurisdictions, the government not only bears the burden of showing that the defendant perpetrated the alleged criminal act, but, once the sanity of the accused has been placed in doubt by the defense, it is also saddled with the ultimate burden of proving, beyond a reasonable doubt, that the defendant was sane at the time he committed the act. *E.g., State v. Evans,* 278 Md. 197, 209 n. 2, 362 A. 2d 629, 636 n. 2 (1976); *Bradford v. State,* 234 Md. 505, 513, 200 A. 2d 150, 155 (1964); *accord, e.g., United States v. Handy,* 454 F. 2d 885, 888 (9th Cir. 1971), *cert. denied,* 409 U. S. 846 (1972). It is a well-established principle, however, that "[t]he defendant has a right ... to compel the state to investigate its own case, find its own evidence, and prove its own facts." *United States v. Wright,* 489 F. 2d 1181, 1195 (D.C. Cir. 1973); *accord, United States v. Brown,* 501 F. 2d 146, 155 (9th Cir. 1974), *rev'd sub nom. on other grounds, United States v. Nobel,* 422 U. S. 225 (1975).[6] If, in its efforts to establish the mental responsibility of the accused following a plea of insanity, the State is permitted to utilize a psychiatrist hired by the defendant, both the defense attorney and his client will be inhibited from "consulting one or more experts, with possibly conflicting views, by the fear that in doing so [they] may be assisting the government in meeting its burden of proof on the [sanity] issue." *United States v. Alvarez, supra,* 519 F. 2d at 1047. Breaching the attorney-client privilege in this situation also would have the effect of inhibiting the free exercise of a defense attorney's informed judgment by confronting him with the likelihood that, in taking a step obviously crucial to his client's defense, he is creating a potential government witness who theretofore did not exist. *Id.* The possible impact upon the

---

6. This idea that the prosecution should "shoulder the entire load" has also come to be recognized as an underlying rationale for the constitutional privilege against self-incrimination. *See* Tehan v. United States ex rel. Shott, 382 U. S. 406, 415, 86 S. Ct. 459, 15 L.Ed.2d 453 (1966); Malloy v. Hogan, 378 U. S. 1, 7-8, 84 S. Ct. 1489, 12 L.Ed.2d 653 (1964); 8 J. Wigmore, *Evidence in Trials at Common Law* § 2251, at 317 (McNaughton rev. 1961).

federal and State constitutional rights of the defendant of a rule permitting such testimony further persuades us that we should be reluctant to hold there is a waiver, under the circumstances here, of the attorney-client privilege.[7]

Accordingly, we affirm the judgment of the Court of Special Appeals, which comports with the ruling we make here.

> *Judgment of the Court of Special Appeals affirmed.*
> *Costs to be paid by Montgomery County.*

---

7. A similar fear of conceivably lightening the prosecution's burden of proving its case in chief has led a number of courts to reject requests by the government for unlimited discovery. *See, e.g.,* United States v. Wright, 489 F. 2d 1181, 1191-96 (D.C. Cir. 1973); Prudhomme v. Superior Court of L.A. County, 2 Cal. 3d 320, 466 P. 2d 673, 676-77, 85 Cal. Rptr. 129, 132-33 (1970). *But cf.* Williams v. Florida, 399 U. S. 78, 85, 90 S. Ct. 1893, 26 L.Ed.2d 446 (1970) (requiring defense to give pretrial notice of names of witnesses to be called as part of an alibi defense does not violate fifth amendment); Fed. R. Crim. P. 16 (if defendant seeks discovery government has right to discover books, papers, documents, and scientific or medical reports); Md. Rule 741 d (State allowed discovery of reports of experts and names of alibi witnesses).